**United States District Court**
**Middle District of Florida**
**Tampa Division**


**TODD LATIMER,**

     **Plaintiff,**

v.                                                  Case No.  **8:06-CV-1921-T-30EAJ**

**ROARING TOYZ, INC., ROBERT FISHER,**
**KAWASAKI MOTORS CORP., USA, and**
**HACHETTE FILIPACCHI MEDIA U.S.,**
**INC.,**

     **Defendants.**
_____

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

Before the Court are the parties' cross motions for summary judgment (Dkts. 58 & 59) and their respective responses thereto (Dkts 62, 63, & 69), Plaintiff's Motion for Leave to File a Sur-Reply (Dkt. 73), Defendants' opposition thereto (Dkt. 74), and Defendants' Motion to Bifurcate Trial (Dkt. 75). In his motion to file a sur-reply, Plaintiff seeks leave to address the admissibility as evidence of Defendant's expert witness deposition regarding damages and consideration of the decision in Schrock v. Learning Curve International, Inc., 2008 WL 224280 (N.D. Ill. Jan. 29, 2008) (discussing derivative works). Having considered the parties motions and supporting exhibits, the supporting and opposing memoranda, and the record evidence cited therein, the Court concludes that all Defendants are entitled to summary judgment on Latimer's unfair competition claim, and Defendants Kawasaki and Hachette are entitled to summary judgment on Latimer's copyright infringement claims.

## **Summary Judgment Standard**

Motions for summary judgment should only be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion.  "The requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (emphasis in original).  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990).  The substantive law applicable to the claimed causes of action identifies which facts are material. Id.  Throughout this analysis, the judge must examine the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in his favor.  Id. at 255. Further, "[e]vidence inadmissible at trial cannot be used to avoid summary judgment." Broadway v. City of Montgomery, Ala., 530 F.2d 657, 661 (5th Cir. 1976).  "Even on summary judgment, a court is not obligated to take as true testimony that is not based upon personal knowledge." Citizens Concerned About Our Children v. School Bd. of Broward County, Fla., 193 F.3d 1285, 1295 n. 11 (11th Cir. 1999) (per curiam).

## **Factual Background**[1]

At the request of his friend Bruce Casner, Todd Latimer ("Latimer"), a free-lance fashion photographer, prepared a series of photographs of custom motorcycle parts for an advertising brochure for Defendant Roaring Toyz ("Roaring Toyz").[2] In June, 2005, Casner asked Latimer to accompany him to a motorcycle show held at West Palm Beach, Florida, where Casner introduced Latimer to Robert Fisher ("Fisher"), president of Roaring Toyz (Dkt. 60, Ex. 3 at 62-64; Ex. 6-I at 24; 53-54).

Roaring Toyz displayed a number of customized motorcycles at the West Palm Beach Motorcycle Show. During the show, Latimer took numerous photographs of motorcycles customized by Roaring Toyz (Dkt. 60, Ex. 3 at 68; Ex. 6-I at 71). Between June, 2005, and March, 2006, Latimer photographed a number of motorcycles Roaring Toyz was customizing at its Sarasota, Florida facility. Latimer provided Roaring Toyz copies of some of the photographs taken during this time period for its use on its website (Dkt. 60, Ex. 3 at 80–83; 96–97; 99; Ex. 6-I at 68; 71; 76-77; 78-79).

In mid-2005, Fisher met John Del Cioppo, a.k.a. Jack Del Cioppo, owner and operator of Graphics 2, a New Jersey corporation that had recently relocated to Florida.[3] During the

---

[1]The facts are taken in the light most favorable to Plaintiff for purposes of this discussion only.

[2]Roaring Toyz, Inc., specializes in motorcycle customization and repair services (Dkt. 60, Ex. 3 at 14/23 – 15/1).

[3]According to Del Cioppo, Graphics 2 provides its clients with graphics design assistance related to point of sale, packaging, website development, display advertisements, and catalog production (Dkt. 60, Ex. 7 at 9). DelCioppo testified that prior to moving to Florida, he had 15 to 18 years experience providing marketing advice as well as graphic design services to various companies selling manufactured aftermarket products (Dkt. 60, Ex. 7 at 13).

latter half of 2005 through 2006, Roaring Toyz retained Del Cioppo to manage its websites and advise it on marketing and public relations issues[4] (Dkt. 60, Ex. 7 at 15-16).

Defendant Kawasaki Motor Corporation USA, Inc., ("Kawasaki") manufactures, *inter alia*, motorcycles, utility vehicles, all terrain vehicles, and watercraft. Kawasaki began promoting its ZX-14 motorcycle in September 2005 (Dkt. 69, Ex. 5). While preparing for the introduction of the ZX-14 motorcycles, Kawasaki personnel noted a trend developing in the marketplace for customized motorcycles. Since Kawasaki did not manufacture or sell customized motorcycles, it arranged for two ZX-14s to be delivered to Roaring Toyz in January, 2006, for customization. Decisions regarding how the customization should be done, as well as what the final product should look like, were left to Roaring Toyz (Dkt. 60, Ex. 3 at 28; 53-54).

Roaring Toyz commissioned Ryan Hathaway, an independent contractor who operated a one-man shop engaged in custom paint work and graphics design, to customize the paint on the ZX-14s. While Hathaway and Fisher discussed graphics styles and color schemes, Hathaway made the final decisions as to the design and color of the artwork on the ZX-14s (Dkt. 60, Ex. 5 at 13-16; 19-20; 21-22). During January and February, 2006, Hathaway worked in his shop in Lake Placid, Florida, designing the artwork, selecting the paint colors, and painting the ZX-14s. Id. at 5-6; 13-16; Ex. 3 at 147-48.

---

[4]Del Cioppo estimated that Roaring Toyz paid him approximately $30,000.00 for his services in 2006.

Meanwhile, in January, 2006, Latimer was retained by 2Wheel Tuner "to follow the build" of the ZX-14s and provide 2Wheel Tuner with photographs of the motorcycles at various stages of the customization process for inclusion with a magazine article.

On February 23, 2006, Fisher learned from Del Cioppo that Kawasaki wanted photographs of the customized ZX-14s. Roaring Toyz had one day in which to provide the requested photographs. Fisher contacted Latimer regarding Kawasaki's request for photographs, explaining the tight deadline when they spoke. Latimer agreed to travel to Sarasota to conduct a photo shoot that evening.  Id.

When Latimer arrived at Roaring Toyz with his photography equipment, shop personnel had not yet completed assembling the ZX-14s.  Because they did not have a kick stand for both motorcycles, the ZX-14s could not be transported off-site, so Roaring Toys personnel assisted Latimer in setting up the ZX-14s for the photo shoot in front of the shop. Because they were in a hurry to get the photographs done, Roaring Toyz personnel also assisted Latimer by running "extension cords and power cables for lights and cables for cameras and things, and you know, background, [and] flooring," but Latimer made the decisions regarding lighting, the appropriate camera equipment and lens, and camera settings, as well as use of the white background consistent with the industry practice Latimer noted in studying other advertising photographs.

Latimer worked throughout the night of February 23-24 taking photographs of the ZX-14s as requested by Kawasaki. Once the photo session concluded, Latimer asked Fisher

for $800.00 as payment for photographs of three R-1 and three Hayabasa motorcycles taken on February 14 and 16, 2006. Fisher wrote Latimer an $800.00 check.

When Latimer left Roaring Toyz the morning of February 24, 2006, he took the pictures of the ZX-14s with him so he could make any necessary modifications.  Latimer e-mailed "clean shots" of the ZX-14s to Del Cioppo during the morning of February 24, 2006, believing at the time that Del Cioppo was going to design a placard to use during the introduction of the ZX-14 at Bike Week held in Daytona, Florida, March 3-8, 2006, using his photographs after getting Kawasaki's approval thereof (Dkt. 60, Ex. 3 at 103-04; 108-09; 116-17; 119-120; 123-33; Ex. 6-II at 112).  Each of the photographs Latimer delivered to Del Cioppo had a metadata[5] file attached that provided the viewer with technical information and copyright notice for the photograph.

Once Del Cioppo received the images from Latimer, he sent them on to Kawasaki by e-mail (Dkt. 60, Ex. 7 at 86–87; 90).[6]  Subsequently, Del Cioppo informed Latimer that Kawasaki was so impressed with his photographs that it wanted to include five of the photographs in the material it planned to distribute during the ZX-14 press introduction to

---

[5]Metadata, commonly described as "data about data," is defined as "a set of data that describes and gives information about other data." Oxford English Dictionary. Technical Appendix E to The Sedona Guidelines: Best Practice Guidelines & Commentary for Managing Information & Records in the Electronic Age defines metadata to include "all of the contextual, processing, and use information needed to identify and certify the scope, authenticity, and integrity of active or archival electronic information or records." Examples of metadata for electronic documents include: a file's name, a file's location ( e.g., directory structure or pathname), file format or file type, file size, file dates ( e.g., creation date, date of last data modification, date of last data access, and date of last metadata modification), and file permissions ( e.g., who can read the data, who can write to it, and who can run it).

[6]Initially, Latimer testified that he believed Del Cioppo would be preparing the placards. Latimer later testified that he was aware that Kawasaki would have to approve the ZX-14 photographs before they could be used and that he believed that Kawasaki was going to prepare the placards (Dkt. 60, Ex. 6-I at 260).  Given Latimer's testimony that he consented to Kawasaki using his photographs in the press materials for the Las Vegas introduction of the ZX-14 to the media, this contradiction is not relevant to the issues before the Court.

-6-

be held in Las Vegas, Nevada, February 26-28, 2006.  At that time, Del Cioppo was the only person who had any communication with Kawasaki regarding use of the photographs. According to Latimer, he was under the impression that the photographs would be used in a "screen" presentation in connection with the public launch of the ZX-14s. Latimer informed Del Cioppo that Kawasaki could use of the photographs conditioned on Kawasaki giving him credit as the photographer (Dkt. 60, Ex. 6-II at 102-03; 110-12).  Latimer's photographs, with their respective metadata file attached, were included on a compact disk distributed to approximately 30 members of the media who attended the introduction of the ZX-14 motorcycle, including a representative of Cycle World Magazine[7] ("CWM"), a publication owned by Defendant Hachette Filipacchi Media U.S.  (Dkt. 60, Ex. 2 at 32).

 On June 2, 2006, more than three months after Kawasaki published Latimer's ZX-14 photographs by including them in its media kit,[8] the Register of Copyrights granted Latimer's

---

[7]Cycle World, a monthly publication targeting motorcycle enthusiasts, is distributed through subscriptions and newsstand sales throughout the United States and in some foreign countries.

[8]The significance of this delay is illustrated by the provisions of 17 U.S.C. § 412:

In any action under this title, . . .  no award of statutory damages or of attorney's fees, as provided by sections 504 and 505, shall be made for –

(1)    any infringement of copyright in an unpublished work commenced before the effective date of its registration; or

(2)    any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work.

17 U.S.C. § 412 (2005).  Section 412 is clarified in the following excerpt from the House Report on the 1976 Copyrights Act, 90 Stat. 2541 (1976):

Under the general scheme of the bill, a copyright owner whose work has been infringed before registration would be entitled to the remedies ordinarily available in infringement cases: an injunction on terms the court considers fair, and his actual damages plus any applicable profits not used as a measure of damages. However, section 412 would deny any award of the special or "extraordinary" remedies of statutory damages or attorney's fees where infringement of copyright in an unpublished

request for registration of a compilation of his photographs of the ZX-14 motorcycles, five of which are the protected works at issue in these proceedings, under Certificate of Registration No. VAu 700-638 (Dkt. 2, Ex. 1).

Del Cioppo posted Latimer's photographs of the ZX-14s on Roaring Toyz website [www.roaringtoyz.com] to promote and advertise the sale of its merchandise and customization services. The photographs were subsequently also posted on a website featuring Roaring Toyz's customized parts for the ZX-14s, found at www.zx-14parts.com.

While he could not remember the name of the individual with whom he spoke, Del Cioppo testified that he also had discussions with one of the publishers at CWM regarding publishing Latimer's photographs of the ZX-14s (Dkt. 60, Ex. 7 at 125). According to Del Cioppo, he "called in some favors and . . . talked to one of the publishers. . . . to give him an exclusive, the opportunity to come in and photograph the ZX-14s at Roaring Toyz. He declined. . . . It was trying to get some exposure for the Roaring Toyz." Id. Subsequently, CWM published three of the five ZX-14 photographs included in the material Kawasaki distributed during its unveiling of the ZX-14s in Las Vegas. The photographs were published in conjunction with a feature article written by Don Canet that appeared in CWM's June 2006 issue.

---

work began before registration or where, in the case of a published work, infringement *commenced* after publication and before registration (unless registration has been made within a grace period of three months after publication).

Here, the protected work was first published on February 26, 2006. Thus, Latimer had until May 26, 2006, within which to register his copyright for purposes of statutory damages and attorney's fees. Latimer's registration of his copyright is effective June 2, 2006, one week after the three month period expired.

According to Latimer, he learned that the ZX-14 photographs he took on February 23-24, 2006, were being used without his permission when he read a copy of the June, 2006 issue of Cycle World[9] while in a barber shop[10] (Dkt. 60, Ex. 6-I at 203-04; 205). Believing that confronting Defendants about the unauthorized use of his photographs might be "professional suicide," Latimer delayed taking any action until late August, 2006, when he contacted Kawasaki and informed it that his photographs were being used without his permission (Dkt. 60, Ex. 2 at 68-69).

Latimer sues Defendants for federal copyright infringement under 17 U.S.C. § 101 et seq. and unfair competition under Florida common law. Latimer seeks a permanent injunction preventing Defendants from infringing his copyright, an order directing Defendants to tender to him all infringing copies of his protected work that may be in their possession or control or destroy the protected work under a writ of destruction issued pursuant to 17 U.S.C. § 503, plus actual damages suffered as a result of the infringement and/or disgorgement of Defendants' profits that are not taken into account in computing actual damages (Dkt. 2 at 4-5).

---

[9]There are references in the record to the publication of Latimer's photographs in Cycle World's Annual Sport Bike Edition. No such allegation is included in the complaint, and Latimer has not moved to amend the complaint to add this claim.

[10]The date on which Latimer made this discovery is unclear. Latimer testified that he contacted an attorney before filing his request for copyright registration because he had learned that his photographs were being used without his permission. He has little recall of the details, however. As stated above, Latimer's request for copyright registration was approved on June 2, 2006.

## Legal Analysis

As discussed above, Latimer's central claims, brought pursuant to 17 U.S.C. § 501, allege that Defendants infringed his copyright in the ZX-14 photographs. Photographs received federal copyright protection in the Act of March 3, 1865, 38th Cong., 2d Sess., 16 Stat. 198. The idea that photography is art deserving copyright protection is now well settled. See 17 U.S.C. §§ 101,[11] 102(a)(5); see also Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53, 58 (1884) ("[T]he Constitution is broad enough to cover an act authorizing copyright of photographs, so far as they are representatives of original intellectual conceptions of the author."); Ets-Hokin v. Skyy Spirits, Inc., 225 F.3d 1068, 1074-75 (9th Cir. 2000) (citation omitted) (photographer brought infringement action against vodka producer alleging that producer's use of photographer's "product shots" constituted copyright infringement, fraud, and negligent misrepresentation); Rogers v. Koons, 960 F.2d 301, 306 (2d Cir.), cert. denied, 506 U.S. 934 (1992).

At its core, copyright law seeks "to promote the dissemination of creative expression, and provide incentives for copyright owners to produce . . . original works." CBS Broad., Inc. v. EchoStar Communications Corp., 265 F.3d 1193, 1211 (11th Cir. 2001). The plaintiff in a § 501 action establishes a prima facie case of copyright infringement by proving by a preponderance of the evidence (1) that he owns a valid copyright in the work allegedly

_____

[11]"'Pictorial, graphic, and sculptural works' include two-dimensional and three-dimensional works of fine, graphic, and applied art, photographs, prints and art reproductions, maps, globes, charts, diagrams, models, and technical drawings, including architectural plans. Such works shall include works of artistic craftsmanship insofar as their form but not their mechanical or utilitarian aspects are concerned; the design of a useful article, as defined in this section, shall be considered a pictorial, graphic, or sculptural work only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article." 17 U.S.C. § 101.

infringed, and (2) that the defendant(s) copied that work. <u>Original Appalachian Artworks,</u>

<u>Inc. v. Toy Loft, Inc.</u>, 684 F.2d 821, 824 (11th Cir. 1982) ("The law is well settled that absent

a fraud, or any purposeful attempt to mislead the Copyright Office, the court would not

invalidate an otherwise valid Certificate of Registration").

Although copyright protection attaches at the time of an author's creation of an

original work susceptible to copyright under 17 U.S.C. § 102(a), an owner's cause of action

for infringement of that copyright is unenforceable until compliance with the formalities of

registration, including payment of fees and deposit of copies of the work. 17 U.S.C. § 411.

Ownership is also demonstrated through such compliance. In cases like Latimer's where

registration was filed within five years after first publication of the work, the certificate of

registration for the work "constitute(s) prima facie evidence of the validity of the copyright

and of the facts stated in the certificate," 17 U.S.C. § 410(c), including the requirements of

originality and susceptibility to copyright under 17 U.S.C. § 102(a). <u>See</u> 3 Nimmer on

Copyright § 13.01[A] at 13-4. The burden then shifts to the defendants to rebut this

presumption of validity. <u>See</u> <u>id</u>. at 13-5.

**Defendants' Motion for Summary Judgment**

Defendants do not dispute having used Latimer's photographs in activities of

commercial value.  Given that Latimer has produced a certificate of copyright registration

for the ZX-14 photographs, he benefits from a rebuttable presumption that the copyright is

valid. See 17 U.S.C. § 410(c) (1994). The burden, therefore, has shifted to the Defendants,

who are required to demonstrate that "the work in which copyright is claimed is

-11-

unprotectable (for lack of originality) or, more specifically, to prove that . . . the copyrighted work actually taken is unworthy of copyright protection." Bateman v. Mnemonics, Inc., 79 F.3d 1532, 1541 (11th Cir. 1996).  While the Defendants are permitted to copy the *idea* presented by Plaintiff's photographs, they cannot simply make copies of the photographs. Blackman v. Hustler Magazine, Inc., 620 F.Supp. 792, 796 (D.D.C. 1985) (magazine which published a photographer's photographs infringed the photographer's copyrights), aff'd in part, rev'd in part, 800 F.2d 1160 (D.D.C. 1986) (on issue of damages).

**Derivative Work**

In an effort to establish that Latimer's photographs are unprotectable, Defendants assert that the subject matter of the action, the photographs of the Kawasaki ZX-14 taken by Latimer on February 23 – 24, 2006, are "unauthorized derivative works[12] based upon protectable preexisting works created and owned by Ryan Hathaway, and for which uses Latimer had not requested nor received a license" (Dkt. 60, Ex. 5 at 22-23; Ex. 6-II at 139-40). Defendants rely on Hathaway's deposition testimony, see Dkt. 60, Ex. 5 at 21, to support their argument that the paintwork on the ZX-14 motorcycles constitutes original and creative expression subject to protection under the copyright laws of the United States. See 17 USC § 102(5). Defendants assert that because the  photographs they are accused of infringing depict both the ZX-14s and Hathaway's artwork (Exhibit A-b, A-c), they incorporate substantial portions of copyrightable works that does not belong to Latimer and for which

---

[12]"A 'derivative work' is a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a 'derivative work'." 17 U.S.C. § 101.

he has no license (17 U.S.C. § 103(a); Dkt. 60, Ex. 5 at 23). Thus, Defendants conclude, as derivative works of Hathaway's artwork, Latimer's photographs are uncopyrightable.

Under 17 U.S.C. § 101, a derivative work must incorporate a substantial element of a preexisting work of authorship <u>and</u> recast, transform, or adapt those elements. <u>See</u> <u>SHL Imaging, Inc. v. Artisan Homes, Inc.</u>, 117 F.Supp.2d 301, 305-06 (S.D. N.Y. 2000) (noting that "any derivative work must recast, transform or adopt the authorship contained in the preexisting work," the Court found that "the authorship of the photographic work is entirely different and separate from the authorship of the sculpture" depicted in the photograph). As explained in <u>SHL Imaging</u>, "a photograph of . . . [a] 'Puppy' sculpture in Manhattan's Rockefeller Center[ ] merely depicts that sculpture; it does not recast, transform, or adopt . . . [the] sculptural authorship. . . . [A]uthorship of the photographic work is entirely different and separate from the authorship of the sculpture." <u>Id.</u> at 306.  The <u>SHL</u> court further noted:

> This is not to suggest that photographs are incapable of derivative authorship. A cropped photograph of an earlier photograph is a derivative work. Re-shooting an earlier photographic work with some alteration of the expressive elements is another example. However, in both cases the nature of photographic authorship would have been recast, adapted, or transformed. Since plaintiff's photographs merely depict defendants' frames and do not recast, adapt or transform any authorship that may exist in the frames, they are not derivative works.

<u>Id.</u>

It is undisputed that the artwork on the motorcycles is the original, creative expression of Ryan Hathaway, and as such, entitled to copyright protection.[13] Defendants contend that

---

[13]Defendants attack the validity of Latimer's copyright because the paintwork on the ZX-14s was done by Ryan Hathaway, who Defendants claim was an independent contractor (rather than a Roaring Toyz employee) with no written contract expressly identifying his design as a "work for hire." Generally, ownership of a copyright vests initially with the author of the work. 17 U.S.C. § 201(a) ("[T]he author is the party who actually creates the work, that is, the person

since Hathaway did not grant a license to Latimer to make a derivative work by photographing Hathaway's artwork, the photographs at issue are unauthorized derivative works.  The Copyright Act states that "[a] work consisting of editorial revisions, annotations, elaborations, or other modifications [to a preexisting work that], as a whole, represent an original work of authorship, is a 'derivative work.'" 17 U.S.C. § 101. If, however, it is non-infringing and sufficiently original, such a work qualifies for a separate copyright. See 17 U.S.C. § 103 (1994); Stewart v. Abend, 495 U.S. 207, 223-24 (1990).

The Court rejects Defendants' argument that Latimer can have no copyrightable interest in his photographs. Here, Latimer has not altered Hathaway's artwork, recast it, or otherwise transformed it during the photographic process.  See Lee v. A.R.T. Co., 125 F.3d 580, 582-83 (7th Cir. 1997). The ZX-14s are the subject of the photographs. Hathaway's artwork has not been transformed in the slightest - it is presented in a different medium, but it has not been changed in the process such that it meets the criteria for a derivative work under copyright law.  While Latimer has copyrighted photographs of the ZX-14s, he does not seek to monopolize the subject matter or idea of the photographs but merely to protect the

---

who translates an idea into a fixed, tangible expression entitled to copyright protection.") See Community for Creative Non-Violence v. Reid, 490 U.S. 730, 737 (1989) (citing 17 U.S.C. § 102). Where the creation is a "work for hire," the author (and, accordingly, the owner) of the work is considered to be the actual creator's employer.

Here, Hathaway worked in his own shop located in Lake Placid, Florida, approximately 30 minutes from Roaring Toyz facility in Sarasota, Florida.  Hathaway had provided services to Roaring Toyz for five to six years, during which he also produced work for other companies and individuals. While Roaring Toyz could commission other work, it did not have the right to arbitrarily assign Hathaway additional projects, and Hathaway retained complete  discretion over when and how long he worked.  Early in their relationship, Roaring Toyz paid Hathaway in cash, but by the time the ZX-14 project commenced, Roaring Toyz had begun paying by check upon completion of a project.  Roaring Toyz works with the customization of the equipment on the motorcucles, leaving body and paint work to outside contractors such as Hathaway, eliminating the need to provide employee benefits and leaving the tax treatment to the contractor. Applying the factors set out in Reid, Hathaway's artwork on the ZX-14s does not constitute a work for hire under the Copyright Act.  See 17 U.S.C. §§ 102; 201. Hathaway has not taken the steps necessary under the Copyright Act  to register his art work on the ZX-14s.

-14-

actual reproduction of his expression of the idea, to wit, the photographs themselves. As in SHL Imaging, Latimer has not "recast, transform[ed], or adopt[ed]" Hathaway's artwork.[14] Defendants' argument that Latimer's photographs are derivative works lacks merit.

As to originality, as noted above, courts as well as photographers have recognized the artistic nature of photography. Copyright protection, however, extends only to original aspects of the work such as posing of the subject matter, lighting, angle, selection of film and camera, evoking a desired expression, and almost any other variant involved. Rogers v. Koons, 960 F.2d at 306; see also Epic Metals Corp. v. Condec, Inc., 867 F.Supp. 1009, 1013 (M.D. Fla. 1994); Gentieu v. John Muller & Co., Inc., 712 F.Supp. 740, 742 (W.D. Mo. 1989). While photography is a species of pictorial work, see 17 U.S.C. §§ 101 (definition of "pictorial, graphic and sculptural works"), 102(a)(5), photography is not defined in the Copyright Act, leaving the courts without congressional guidance as to what attributes of photographic works are necessary to satisfy the originality requirement. The courts have concluded that copyrightable elements of a photograph include, *inter alia*, the photographer's selection of the background, lighting, and shading, positioning of the subject, and determining the timing for the shot. See Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. at 60; Rogers v. Koons, 960 F.2d at 307.

"[T]he quantity of originality that need be shown is modest – only a dash of it will do." Id. (citing Feist Pub., Inc. v. Rural Telephone Serv. Co., Inc., 499 U.S. 340 (1991)).

---

[14]From the record now before the Court, Hathaway appears to have a copyrightable interest in the artwork on the ZX-14s, although not an enforceable right under the Copyright Act because, as discussed above, he has not met the statutory requirements prerequisite to an author bringing suit for copyright infringement.

Elements of originality include all elements that involve the author's subjective judgments in giving visual form to his own mental conception of the product. See, e.g., Burrow-Giles, 111 U.S. at 60; Rogers v. Koons, 960 F.2d at 307; Gross v. Seligman, 212 F. 930, 931 (2d Cir. 1914); Eastern Am. Trio Prods., Inc. v. Tang Elec. Corp., 97 F.Supp.2d 395, 417-18 (S.D.N.Y. 2000); Kisch v. Ammirati & Puris, 657 F.Supp. 380, 382 (S.D.N.Y. 1987).  As noted in SHL Imaging,

> The technical aspects of photography imbue the medium with almost limitless creative potential. For instance, the selection of a camera format governs the film size and ultimately the clarity of the negative. Lenses affect the perspective. Film can produce an array of visual effects. Selection of a fast shutter speed freezes motion while a slow speed blurs it. Filters alter color, brightness, focus and reflection. Even the strength of the developing solution can alter the grain of the negative.

117 F.Supp.2d at 310. The relevant inquiry is whether Latimer has demonstrated originality in his arrangement of the ZX-14 motorcycles. See BellSouth Adv. & Pub. Corp. v. Donnelley Info. Pub., Inc., 999 F.2d 1436, 1443 (11th Cir. 1993), cert. denied, 510 U.S. 1101 (1994). Having reviewed the photographs at issue, the Court is of the opinion that they satisfy the elements of artistic craft protected by Latimer's copyright.

**Joint Authors**

Defendants' contention that Hathaway and/or Fisher and Del Cioppo are "joint authors" of the photographs likewise fails.  "Copyright in a work protected under this title vests initially in the author or authors of the work. The authors of a joint work are coowners of copyright in the work."  17 U.S.C. § 201(a).

-16-

> Two basic and well-established principles of copyright law are restated in
> section 201(a) [subsec. (a) of this section]: that the source of copyright
> ownership is the author of the work, and that, in the case of a "joint work," the
> coauthors of the work are likewise coowners of the copyright. Under the
> definition of section 101 [section 101 of this title], a work is "joint" if the
> authors collaborated with each other, or if each of the authors prepared his or
> her contribution with the knowledge and intention that it would be merged
> with the contributions of other authors as "inseparable or interdependent parts
> of a unitary whole." The touchstone here is the intention, at the time the
> writing is done, that the parts be absorbed or combined into an integrated unit,
> although the parts themselves may be either "inseparable" (as the case of a
> novel or painting) or "interdependent" (as in the case of a motion picture,
> opera, or the words and music of a song).

17 U.S.C. § 201, Notes of Comm. on the Judiciary, H.R. Rpt. No. 94-1476. In order to find

joint authorship, the Court must also find that the putative co-authors, at some time, shared

an intent to be co-authors. Here, there is no evidence that Hathaway and Latimer

"collaborated with each other," or that each of them prepared his contribution "with the

knowledge and intention that it would be merged with the contributions of other authors as

'inseparable' or "interdependent" parts of a unitary whole.

Hathaway executed a document purporting to transfer his rights in works performed

for Roaring Toys to Roaring Toyz, Inc., on February 4, 2007. Since Defendants' argument

that Hathaway and Latimer were "joint authors" fails, it is axiomatic that this transfer did not

give Roaring Toyz a copyrightable interest in Latimer's photographs.

Likewise, Defendants' contention that Fisher and Del Cioppo are "joint authors" of

the photographs fails.  Fisher testified that he told Latimer the "idea or concept" that he

wanted to see in the pictures, including "how and where to move the motorcycles around to

get the angles that we wanted to try and hide different portions of the bikes that were

incomplete and missing" (Dkt. 60, Ex. 3 at 113).  Fisher further testified that he asked Latimer to photograph the ZX-14s from certain angles "to create different views of the bikes and different components that we had accessorized the bikes with, plus . . . placement of the motorcycles . . . because we had to have somebody duck behind the bikes to hold it [sic] up because there was no kick stand so it was a little tricky" (Dkt. 60, Ex. 3 at 114). Fisher further testified that because he found the white backdrop boring and wanted some "street shot" photographs, he asked Latimer to move the shoot outdoors into the parking lot (Dkt. 60, Ex. 3 at 117).

Del Cioppo arrived at the photo shoot between 9:00 and 9:30 p.m.  Del Cioppo testified that he recalled seeing Fisher move the ZX-14s on at least one occasion during the photo shoot, but he did not know if Fisher was acting under Latimer's direction when he did so.  When asked if he observed anyone directing Latimer to photograph the ZX-14s "from a certain angle," Del Cioppo testified that he was "adamant about the Red ZX-14 being in the forefront" to "show off" its side panel, which has 14 slots (Dkt. 60, Ex. 7 at 103-04; 117). Del Cioppo testified that the photographs Latimer e-mailed to him following the photo shoot were "in a finished state." According to Del Cioppo, he does not recall having done so, but he "may have resized" the photographs. Id.

The Court has reviewed the deposition testimony of both Fisher and Del Cioppo and finds that the contributions Fisher and Del Cioppo describe having made to the composition of the protected works was not sufficient to rise to the level of "substantive" such that they, jointly or severally, became "joint" authors of those works.  The author is the party who

actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection. <u>Community for Creative Non-Violence v. Reid</u>, 490 U.S. 730, 737 (1989). Here, the situation of coownership is not presented by the facts of this case. <u>See</u> <u>M.G.B. Homes, Inc. v. Ameron Homes, Inc.</u>, 903 F.2d 1486, 1493 (11th Cir. 1990). Latimer made all technical decisions regarding the photographing of the ZX-14s, as well as the staging of the shots, and translated the idea into a fixed, tangible expression. Suggestions by Fisher for positioning of the motorcycles to minimize exposure of their unfinished state does not render him an "author" of the photographs. Likewise, Del Cioppo is not a "creator"[15] of the copyrighted work at issue here. His ideas, conveyed to the author of the copyrighted work, were not copyrightable. 17 U.S.C. § 102(b). Failure of Fisher and Del Cioppo "to have 'created' or 'prepared' the work within the meaning of the statute bars [them] asserting a copyright interest even as a joint author" of the photographs. <u>See</u> <u>id.</u> at 1493. As Nimmer stated in his treatise on copyright, to be considered an author, one's contribution must be of authorship – "physical labor does not make the grade. . . ." 1 Melville B. Nimmer & David Nimmer, <u>Nimmer on Copyright</u> § 6.07[A][2].

Defendants have not demonstrated that Fisher or Del Cioppo ever intended to share authorship with Latimer. The Court finds that Fisher and Del Cioppo are not joint authors of the ZX-14 photographs at issue in this case. Thus, the argument that "Roaring Toyz, Inc., and its licensees have at all times acted within their rights as assignees and licensees of a joint author(s) of the works" fails.

---

[15]A work is "created" when "it is fixed in a copy . . . for the first time." 17 U.S.C. § 101.

## Implied License

The Copyright Act provides that "[a] transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a). It is undisputed that Latimer never executed a document granting an exclusive license to Defendants, and therefore, no valid transfer of copyright ownership under the Copyright Act took place.

In contrast to an exclusive license, a nonexclusive license to use a copyright "'may be granted orally, or may even be implied from conduct.'" Korman v. HBC Florida, Inc., 182 F.3d 1291, (11th Cir. 1999) (quoting Effects Associates, Inc. v. Cohen, 908 F.2d 555, 558 (9th Cir. 1990)[16]). Section 101 excludes the assignment of nonexclusive licenses from the definition of "transfer of copyright ownership." Kawasaki requested that Roaring Toyz provide it with photographs of the customized ZX-14s.  Roaring Toyz asked Latimer to do the photography. Latimer created the photographs at issue at Roaring Toyz's request and e-mailed the proofed photographs to Del Cioppo, knowing that Kawasaki had to approve the photographs before they could be used on a placard. He authorized use of the photographs on a "placard" and, according to Latimer, instructed Del Cioppo that no further use of the photographs was authorized.

---

[16]In Effects Associates, the Ninth Circuit held that a special effects company had granted a movie producer an implied nonexclusive license to use the special effects footage it had created. The court reasoned that because the special effects company had "created a work at defendant's request and handed it over, intending that defendant copy and distribute it," it had impliedly granted the defendant a nonexclusive license. Id.

Impressed with Latimer's photographs, Kawasaki requested permission to use the photographs for inclusion in its press release materials. This request was conveyed to Latimer by Del Cioppo. Latimer consented to Kawasaki's request, conditioned on his receiving credit for his work (Dkt. 60, Ex. 6-I at 116-17; 120). See Jacob Maxwell, Inc. v. Veeck, 110 F.3d 749 (11th Cir. 1997). The metadata files for the photographs included in the press kit contained Latimer's copyright notice.

Latimer impliedly granted Kawasaki a nonexclusive license to use the photographs in its press release materials. Kawasaki, in turn, distributed a compact disk containing five of Latimer's photographs to members of the media, including a CWM representative.

Here federal copyright law renders any oral agreement that Latimer may have had with Roaring Toyz and Kawasaki unenforceable insofar as it provided for the transfer of an exclusive copyright. The Eleventh Circuit has recognized that "in these circumstances, a court has no choice but to look at alternatives beyond the parties' intended arrangement." Jacob Maxwell, Inc. v. Veeck, 110 F.3d at 752. While it may well be that Latimer initially contemplated an exclusive license, Latimer cannot reasonably deny, given his subsequent conduct here, that he granted to Kawasaki the sort of lesser, nonexclusive license to use the photographs in promoting its unveiling of the ZX-14s that federal law recognizes may result from a purely oral transaction.

Latimer's failure to withdraw permission for use of the photographs until August 2006 clearly evidenced his consent for Kawasaki to use the photographs in promoting the introduction of the ZX-14s. Implicit in that permission was a promise not to sue for copyright

infringement – a promise that at least one court has found to be the essence of a nonexclusive license. See In re CFLC, Inc., 89 F.3d 673, 677 (9th Cir. 1996) ("[A] nonexclusive patent license is, in essence, 'a mere waiver of the right to sue' the licensee for infringement.") (quoting De Forest Radio Telephone & Telegraph Co. v. United States, 273 U.S. 236, 242 (1927)). It follows that until permission was withdrawn in August, Latimer granted Kawasaki a nonexclusive license to use the photographs of the ZX-14s.

As to Defendant Hatchette, a copyright grants to the owner several exclusive rights, including the right to reproduce the copyrighted work and to distribute copies to the public, but under the "fair use" doctrine, codified at 17 U.S.C. § 107, some limited and useful forms of copying and distribution are tolerated as exceptions to copyright protection.  See Pacific and Southern Co., Inc. v. Duncan, 744 F.2d 1490, 1494 (11th Cir. 1984).  Specifically, § 107 provides that fair use may be made of material "for purposes such as criticism, comment, news reporting, teaching. . . , scholarship, or research."  17 U.S.C. § 107.  The four factors in determining fair use are:

1.    the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

2.    the nature of the copyrighted work;

3.     the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

4.    the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107; <u>Pacific and Southern Co., Inc. v. Duncan</u>, 744 F.2d 1490, 1495 (11th Cir. 1984).

A representative of CWM, owned and published by Defendant Hachette, received a copy of the compact disk Kawasaki distributed at its introduction of the ZX-14s to the press. The photographs were used without modification in a feature article published in the June 2006 issue of Cycle World. A review of the article accompanying the publishing of Latimer's photographs reveals that the article was of a technical nature, reviewing and commenting on the design and performance of the ZX-14 motorcycle. Latimer makes no allegation that Defendant Hachette acted in bad faith in publishing the photographs. The photographs themselves were not offered for commercial gain, and there is no indication that the use of the photographs in Cycle World's article affected the "potential market for or value" of the photographs. To the contrary, Latimer testified that by the time Cycle World published its review of the ZX-14s, with accompanying photographs, two of his photographs of the ZX-14s had been published on placards used at the Kawasaki display booth during Daytona Beach Bike Week in March 2006, and his article, with accompanying photographs, had already been published in 2Wheel Turner. Following publication of the photographs in Cycle World, Latimer successfully marketed the right to use the photographs to two foreign publications. Applying the § 107 factors, the Court concludes that Latimer's claim against Defendant Hatchette fails. Thus, Defendants Kawasaki and Hachette are entitled to judgment as a matter of law on Latimer's copyright infringement claims.

As to the use of Latimer's photographs of the ZX-14s on the Roaring Toyz websites, there are genuine issues of material fact that preclude granting Defendants' summary judgment in favor of Roaring Toyz and Fisher. Latimer consistently maintains that both before and after the ZX-14 photographs were made, he informed Fisher that his photographs were not to be "leaked," meaning, according to Latimer, that they were not to be posted on any website (Dkt. 60, Ex. 6-I at 133). Fisher maintains that the photographs were posted on the website with Latimer's permission, as had been their arrangement from the time Latimer began taking photographs of Roaring Toyz work in June 2006.

An implied nonexclusive license may be established through the parties' course of dealing. Given the contradictions in testimony regarding their course of dealing, a reasonable juror may find that Latimer and Roaring Toyz/Fisher had entered into a mutually beneficial business relationship, with Roaring Toyz/Fisher benefiting from the use of Latimer's photographs on the website and Latimer benefiting from the link between the Roaring Toyz website and his website, as well as the introductions Fisher provided Latimer to people in the motorcycle industry. In light of Latimer's acknowledgement that he gave Kawasaki his consent to use the photographs in its press kit, to be distributed two days after the photographs were taken, and on placards that were to be displayed in the Kawasaki booth at Bike Week from March 3 through 8, 2006, a reasonable juror may find that the photographs were used without Latimer's permission on the Roaring Toyz website yet not be persuaded that Latimer incurred any damages as a result.

While Latimer waived his right sue for copyright infringement, an oral understanding with Defendants as to compensation would have been enforceable. The evidence in the record regarding such an understanding is, however, contradictory. Latimer first testified that he never discussed compensation for the ZX-14 photographs with Fisher (Dkt. 60, Ex. 6-I at 143-44). When asked why he did not charge Roaring Toyz a fee for the ZX-14 photographs, the following exchange occurred:

Latimer:    Because these bikes were done, they were completed and I was working on a story [for 2Wheels Turner], so I went down there, and I could have shot these and got filed in case someone tried to scoop me at Daytona or anybody else.

. . . .

Attorney:    So you were compensated because you could use these [photographs] in your magazine article?

Latimer:    Yes, these had value.

Attorney:    Okay. So therefore you never charged Mr. Fisher for these photographs?

Latimer:    I was not paid for the shoot, no.

Dkt. 60, Ex. 6-I at 145.  Latimer later contradicted this testimony, stating that he always requested payment before he delivered the final product to a client, and he was sure he made a request for payment for the ZX-14 photographs, Dkt. 60, Ex. 6-I at 273-74. Latimer again emphasized, however, that he believed that "the most valuable part [of the photographs] was the publicity," id. at 275.

Fisher testified that before Latimer left the shop on February 24, 2006, Latimer went to Fisher's office and asked for $800 as payment for his services that night. Surprised because Latimer had never requested payment for previous photographs, Fisher nonetheless wrote Latimer an $800.00 check. Latimer, on the other hand, testified that Fisher owed him $800.00 for prior work on February 14 and 16, 2006.  Latimer further testified that when the shoot was finished, he went to Fisher's office and stated "I'm done. I need to be paid." According to Latimer, the request for payment had nothing to do with the ZX-14 photo shoot.

As discussed above, a finding that Fisher paid Latimer for his services may, under the circumstances, render the photographs a work for hire. See supra n.10 discussing works for hire. If Defendants establish that the photographs qualify as works for hire, Fisher and Roaring Toyz had the right to unfettered use of the photographs. This matter will proceed to trial on Latimer's copyright claims against Roaring Toyz and Fisher.

**Common Law Unfair Competition Claim**

The Eleventh Circuit has considered whether section 301(a) of the Copyright Act preempts an unfair competition claim. See, e.g., Lipscher v. LRP Publications, Inc., 266 F.3d 1305, 1312 (11th Cir. 2001) (affirming dismissal of unfair competition claim because it was based on "acquisition misconduct," and, since acquisition of a work is a necessary condition to copying it, there is no "extra element" removing it from the general scope of a copyright claim). Latimer seeks only to protect those rights equivalent to those protected in § 106 of the Copyright Act. Accordingly, in the absence of any allegations of the necessary "extra element," Latimer's unfair competition claim is preempted and must be dismissed.

**Plaintiff's Motion for Summary Judgment**

Plaintiff has filed a Motion for Summary Judgment as to Defendants' 3rd, 8th, 14th and 15th Affirmative Defenses , set forth below:

3. Defendants are joint authors of the works, or are licensees of a joint author and as such have independent rights including the right to use and reproduce the work, and to grant licenses to third parties to use and reproduce the work. Defendants have at all times acted within their rights as joint authors or licensees.

8. Defendant Roaring Toyz, Inc. has received an assignment of the copyright of a joint author(s) of the work and, thus, has rights in the works, including but not limited to the right to reproduce and use the works, and grant licenses to third persons to reproduce and use the works. Defendant Roaring Toyz, Inc. and its licensees have at all times acted within their rights as assignees and licensees of a joint author(s) of the works.

14. Latimer's contribution to the derivative works is *de minimis*, lacks sufficient originality, and is incapable of constituting copyrightable subject matter.

15. Latimer's works are not subject to the protection of copyright because the works constitutes [sic] only *scenes â faire*, and are subject to the doctrine of merger whereby the idea of depicting customized Kawasaki ZX-14 motorcycles has merged with Latimer's expression of such.

Dkt. 58.  As set forth above, Affirmative Defenses 3 and 8 challenge Latimer's standing as the sole copyright owner of the ZX-14 photographs, and Affirmative Defenses 14 and 15 attack the copyrightability of the photographs.  Based on the Court's findings, discussed above, Latimer's challenge to Affirmative Defenses 3, 8, and 14 has merit.

As to Affirmative Defense 15, underpinning the idea-expression divide lay the doctrines of *scènes à faire* and merger. Just as ideas are not copyrightable, neither are expressions that are commonly associated with or naturally flow from certain themes and

subjects. This concept, known as *scenes à faire*, recognizes that certain expressions lack enough originality to justify copyright protection. <u>Beal</u>, 20 F.3d at 459-60 (holding mosque-style palace with minarets *scènes à faire* in story about Arabian or African royalty). In <u>Schwarz v. Universal Pictures Co.</u>, the court adopted the French phrase "*scènes à faire,*" which it translated as "scenes which 'must' be done" as a matter of dramatic necessity, and concluded that the occurrence of such scenes in two works did not form a basis for finding that the accused work infringed the copyrighted work.

The phrase "*scènes à faire*," widely adopted by subsequent courts, is recognized today to be a term of art in copyright law. However, "a work may be protected by copyright law when its otherwise unprotectable elements are arranged in a unique way." <u>Corwin v. Walt Disney Co.</u>, 475 F.3d 1239, 1251 (11th Cir. 2007) (citing <u>Rogers v. Koons</u>, 960 F.2d 301, 307 (2d Cir. 1992) (observing that the arrangement of puppies in a photograph may constitute a protectable element); <u>Roulo v. Russ Berrie & Co.</u>, 886 F.2d 931, 939 (7th Cir. 1989) (observing that, although size of greeting cards, color of paper, ink, border designs, general concept of stripes, ellipses and single-side format are not individually protectable, "it is the unique combination of these common elements which form the copyrighted material"). <u>See also</u> <u>Atari, Inc. v. N. Am. Philips Consumer Elecs. Corp.</u>, 672 F.2d 607, 616 (7th Cir.), <u>cert. denied</u>, 459 U.S. 880 (1982) (describing *scènes à faire* as "incidents, characters or settings which are as a practical matter indispensable, or at least standard . . . in the treatment of a given topic").

The merger doctrine states that where an idea is inseparably connected to a particular expression, the idea and the expression are said to have "merged" with one another. "Under the merger doctrine, 'expression is not protected in those instances where there is only one or so few ways of expressing an idea that protection of the expression would effectively accord protection to the idea itself.'" BellSouth Adv. & Pub. Corp. v. Donnelley Info. Pub., Inc., 999 F.2d at 1442 (citation omitted) ("Because this is the one way to construct a useful business directory, the arrangement has 'merged' with the idea of a business directory, and thus is uncopyrightable."). Such connection between idea and expression is not protected under copyright law because it would contravene the notion of original expression protection by unfairly granting a monopoly to the author and banning all others from expressing the idea.

Given the Court's finding that Latimer's photographs of the ZX-14s meets the originality test, Defendants' *scènes à faire* argument fails. Likewise, Defendants' merger argument fails as a matter of law. The merger defense does not apply in instances where the infringing work is virtually identical to the copyrighted work or when the coordination of facts provided in the work are a result of independent testing. See Epic Metals v. CONDEC, Inc., 867 F.Supp. 1009, 1013-14 (no merger where defendants copied substantial portions of plaintiff's brochures that were created through independent testing); Glades Pharmaceuticals LLC v. Murphy, 77 U.S.P.Q.2d 1384, 1387-88 (N.D.Ga. 2005) (no merger where the defendants copied exact wording of plaintiff's power point presentation). Here, the Defendants acknowledge having used the ZX-14 photographs taken by Latimer without

modification. Thus, Latimer is entitled to summary judgment as to Affirmative Defenses 3, 8, 14, and 15.

## Conclusion

For reasons set forth above, the Court finds that there are no genuine issues of material fact that require submission of this matter to a jury as to Defendants Kawasaki and Hatchette. As to Defendants Roaring Toyz and Fisher, they are entitled to judgment as a matter of law on Latimer's unfair competition claims, but genuine issues of material fact require that this matter go forward on Latimer's copyright infringement claims. The jury will likewise hear evidence regarding Latimer's claim for damages as a result of the alleged infringements. Given these findings, there is no need for the Court to address other issues raised in Plaintiff's motion to file a sur-reply (Dkt. 73) or by Defendants in their Motion to Bifurcate Trial (Dkt. 75).

Accordingly, it is hereby **ORDERED and ADJUDGED** that:

1. Plaintiff's Motion for Leave to File a Sur-Reply (Dkt. 73) is **DENIED**.

2. Defendants' Motion to Bifurcate Trial (Dkt. 75) is **DENIED**.

3. Plaintiff's Motion for Summary Judgement as to Defendants' 3rd, 8th, 14th and 15th Affirmative Defenses (Dkt. 58) is **GRANTED**.

4. Defendants' Motion for Summary Judgment (Dkt. 59) is **GRANTED** as to all Defendants on Latimer's unfair competition claim and Defendants Kawasaki and Hachette

as to Latimer's copyright infringement claims and **DENIED** as to Defendants Roaring Toyz

and Robert Fisher as to Latimer's copyright infringement claims.

5.    The **Clerk** is directed to enter summary final judgment in favor of Defendants

Kawasaki and Hachette on all claims.

**DONE** and **ORDERED** in Tampa, Florida on March 13, 2008.


_____

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

<u>C</u>opies furnished to:
Counsel/Parties of Record

S:\Odd\2006\06-CV-1921 sj mtn final-1 3-11B.wpd