# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**TODD LATIMER,**

     **Plaintiff,**

**v.**                                          **Case No.  8:06-CV-1921-T-30EAJ**

**ROARING TOYZ, INC., ROBERT FISHER,**
**KAWASAKI MOTORS CORP., USA, and**
**HACHETTE FILIPACCHI MEDIA U.S.,**
**INC.,**

     **Defendants.**

_____

## ORDER ON MOTION FOR SUMMARY JUDGMENT

Before the Court is Defendants' motion for summary judgment (Dkt. 59) and briefs filed in support and opposition thereto[1] (Dkts. 63, 69, 91, & 92). Having considered the parties motions and supporting exhibits, the supporting and opposing memoranda, and the record evidence cited therein, the Court concludes that all Defendants are entitled to summary judgment on Latimer's unfair competition claim, and Defendants Kawasaki and Hachette are entitled to summary judgment on Latimer's copyright infringement claims. This

---

[1]The Court entered an order on March 13, 2008, granting summary judgment in favor of all Defendants on Latimer's unfair competition claims and Defendants Hachette and Kawasaki on Latimer's infringement claims (Dkt. 88). Citing Massey v. Congress Life Ins. Co., 116 F.3d 1414, 1417 (11th Cir. 1997), Latimer sought reconsideration on grounds that he lacked notice that implied license or fair use was to be considered on summary judgment (Dkt. 85). Out of an abundance of caution, the Court granted Latimer's motion on April 3, 2008, and allowed him to file a brief addressing the issues raised in his motion for reconsideration.  Latimer filed a Supplemental Brief on April 17, 2008, see Dkt. 91, and Defendants filed a Supplemental Memorandum in Support of Defendant's Motion for Summary Judgment on May 1, 2008, see Dkt. 92. Said order renders Defendants Roaring Toyz and Robert Fisher's motion for reconsideration (Dkt. 87) moot.

matter will proceed to trial on Latimer's copyright infringement claims against Roaring Toyz and Robert Fisher.

## Summary Judgment Standard

Motions for summary judgment should only be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion.  "The requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (emphasis in original). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990).  The substantive law applicable to the claimed causes of action identifies which facts are material. Id. Throughout this analysis, the judge must examine the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in his favor.  Id. at 255. Further, "[e]vidence inadmissible at trial cannot be used to avoid summary judgment." Broadway v. City of Montgomery, Ala., 530 F.2d 657, 661 (5th Cir. 1976). "Even on summary judgment, a court is not obligated to take as true testimony that is not based upon personal knowledge." Citizens Concerned About Our Children v. School Bd. of Broward County, Fla., 193 F.3d 1285, 1295 n. 11 (11th Cir. 1999) (per curiam).

In <u>Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.</u>, the Eleventh Circuit affirmed a district court's finding that an affidavit that contradicted testimony on deposition was a sham when the party merely contradicted its earlier testimony without giving any valid explanation. 736 F.2d 656, 656 (11th Cir. 1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony" (citation omitted)).  The circuit court recently cautioned, however, that

> This rule is applied "sparingly because of the harsh effect [it] may have on a party's case."  Furthermore,
>
> > to allow every failure of memory or variation in a witness' testimony to be disregarded as a sham would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to determine which point in time and with which words the . . . affiant . . . was stating the truth.
>
> As such, "our cases require the court to find some inherent inconsistency between an affidavit and a deposition before disregarding the affidavit.

<u>Allen v. The Board of Public Education for Bibb County</u>, 495 F.3d 1306, 1316 (11th Cir. 2007) (citations omitted).

## **Factual Background**[2]

At the request of his friend Bruce Casner, Todd Latimer ("Latimer"), a free-lance fashion photographer, prepared a series of photographs of custom motorcycle parts for an

---

[2]In considering Defendants' motion, unless otherwise refuted by the record, the facts are taken in the light most favorable to Plaintiff.

advertising brochure for Defendant Roaring Toyz ("Roaring Toyz").[3] In June, 2005, Casner

asked Latimer to accompany him to a motorcycle show held at West Palm Beach, Florida,

where Casner introduced Latimer to Robert Fisher ("Fisher"), president of Roaring Toyz

(Dkt. 60, Ex. 3 at 62-64; Ex. 6-I at 24; 53-54).

Roaring Toyz displayed a number of customized motorcycles at the West Palm Beach

Motorcycle Show. During the show, Latimer took numerous photographs of motorcycles

customized by Roaring Toyz (Dkt. 60, Ex. 3 at 68; Ex. 6-I at 71). Between June, 2005, and

March, 2006, Latimer photographed a number of motorcycles Roaring Toyz was customizing

at its Sarasota, Florida facility. Latimer provided Roaring Toyz copies of some of the

photographs taken during this time period for its use on its website (Dkt. 60, Ex. 3 at 80–83;

96–97; 99; Ex. 6-I at 68; 71; 76-77; 78-79).

In mid-2005, Fisher met John Del Cioppo, a/k/a Jack Del Cioppo, owner and operator

of Graphics 2, a New Jersey corporation that had recently relocated to Florida.[4] During the

latter half of 2005 through 2006, Roaring Toyz retained Del Cioppo to manage its websites

and advise it on marketing and public relations issues[5] (Dkt. 60, Ex. 7 at 15-16).

Defendant Kawasaki Motor Corporation USA, Inc., ("Kawasaki") manufactures, *inter*

*alia*, motorcycles, utility vehicles, all terrain vehicles, and watercraft. Kawasaki began

---

[3]Roaring Toyz, Inc., specializes in motorcycle customization and repair services (Dkt. 60, Ex. 3 at 14/23 – 15/1).

[4]According to Del Cioppo, Graphics 2 provides its clients with graphics design assistance related to point of sale, packaging, website development, display advertisements, and catalog production (Dkt. 60, Ex. 7 at 9). DelCioppo testified that prior to moving to Florida, he had 15 to 18 years experience providing marketing advice as well as graphic design services to various companies selling manufactured aftermarket products (Dkt. 60, Ex. 7 at 13).

[5]Del Cioppo estimated that Roaring Toyz paid him approximately $30,000.00 for his services in 2006.

promoting its ZX-14 motorcycle in September 2005 (Dkt. 69, Ex. 5). While preparing for the introduction of the ZX-14 motorcycles, Kawasaki personnel noted a trend developing in the marketplace for customized motorcycles. Since Kawasaki did not manufacture or sell customized motorcycles, it arranged for two ZX-14s to be delivered to Roaring Toyz in January, 2006, for customization. Decisions regarding how the customization should be done, as well as what the final product should look like, were left to Roaring Toyz (Dkt. 60, Ex. 3 at 28; 53-54).

Roaring Toyz commissioned Ryan Hathaway, an independent contractor who operated a one-man shop engaged in custom paint work and graphics design, to customize the paint on the ZX-14s. While Hathaway and Fisher discussed graphics styles and color schemes, Hathaway made the final decisions as to the design and color of the artwork on the ZX-14s (Dkt. 60, Ex. 5 at 13-16; 19-20; 21-22). During January and February, 2006, Hathaway worked in his shop in Lake Placid, Florida, designing the artwork, selecting the paint colors, and painting the ZX-14s. Id. at 5-6; 13-16; Ex. 3 at 147-48.

Meanwhile, in January, 2006, Latimer was retained by 2Wheel Tuner "to follow the build" of the ZX-14s and provide 2Wheel Tuner with photographs of the motorcycles at various stages of the customization process for inclusion with a magazine article.

On February 23, 2006, Fisher learned from Del Cioppo that Kawasaki wanted photographs of the customized ZX-14s. Roaring Toyz had one day in which to provide the requested photographs. Fisher contacted Latimer regarding Kawasaki's request for photographs, explaining the tight deadline when they spoke. Latimer agreed to travel to Sarasota to conduct a photo shoot that evening. Id.

When Latimer arrived at Roaring Toyz with his photography equipment, shop personnel had not yet completed assembling the ZX-14s.  Because they did not have a kick stand for both motorcycles, the ZX-14s could not be transported off-site, so Roaring Toys personnel assisted Latimer in setting up the ZX-14s for the photo shoot in front of the shop.  Because they were in a hurry to get the photographs done, Roaring Toyz personnel also assisted Latimer by running "extension cords and power cables for lights and cables for cameras and things, and you know, background, [and] flooring," but Latimer made the decisions regarding lighting, the appropriate camera equipment and lens, and camera settings, as well as use of the white background consistent with the industry practice Latimer noted in studying other advertising photographs.

Latimer worked throughout the night of February 23-24 taking photographs of the ZX-14s, as requested by Fisher and Del Cioppo. Once the photo session concluded, Latimer asked Fisher for $800.00 as payment for photographs of three R-1 and three Hayabasa motorcycles taken on February 14 and 16, 2006. Fisher wrote Latimer an $800.00 check.

When Latimer left Roaring Toyz the morning of February 24, 2006, he took the ZX-14 photographs with him so he could make any necessary modifications.  Latimer e-mailed "clean shots" of the ZX-14s to Del Cioppo during the morning of February 24, 2006.  Each

of the photographs Latimer delivered to Del Cioppo had a metadata[6] file attached that provided the viewer with technical information and copyright notice for the photograph.

Once Del Cioppo received the images from Latimer, he sent them on to Kawasaki by e-mail (Dkt. 60, Ex. 7 at 86–87; 90).[7] Subsequently, Del Cioppo informed Latimer that Kawasaki was so impressed with his work that it wanted to include five of the photographs in the material it planned to present during the ZX-14 press introduction to be held in Las Vegas, Nevada, February 26-28, 2006. At that time, Del Cioppo was the only person who had had any communication with Kawasaki regarding use of Latimer's photographs. According to Latimer, he was under the impression that the photographs would be used in a "screen" presentation in connection with the public launch of the ZX-14s.[8] Latimer informed Del Cioppo that Kawasaki could use of the photographs conditioned on Kawasaki giving him credit as the photographer (Dkt. 60, Ex. 6-II at 102-03; 110-12). Latimer's

---

[6]Metadata, commonly described as "data about data," is defined as "a set of data that describes and gives information about other data." Oxford English Dictionary. Technical Appendix E to The Sedona Guidelines: Best Practice Guidelines & Commentary for Managing Information & Records in the Electronic Age defines metadata to include "all of the contextual, processing, and use information needed to identify and certify the scope, authenticity, and integrity of active or archival electronic information or records." Examples of metadata for electronic documents include: a file's name, a file's location ( e.g., directory structure or pathname), file format or file type, file size, file dates ( e.g., creation date, date of last data modification, date of last data access, and date of last metadata modification), and file permissions ( e.g., who can read the data, who can write to it, and who can run it).

[7]Initially, Latimer testified that he believed Del Cioppo would be using the photographs to prepare placards for display during Bike Week. Latimer later testified that he was aware that Kawasaki would have to approve the ZX-14 photographs before they could be used and that he believed that Kawasaki was going to prepare the placards (Dkt. 60, Ex. 6-I at 260). Given Latimer's testimony that he consented to Kawasaki using his photographs in the press materials for the Las Vegas introduction of the ZX-14 to the media, this contradiction is not relevant to the issues before the Court.

[8]As Defendants note, however, Latimer's statement in the February 24, 2006 e-mail he sent to Del Cioppoi at 11:13 a.m. confirms that he did not limit Kawasaki's use to "placards" or a computer generated presentation flashed on a screen. Latimer clearly granted Kawasaki leave to publish the pictures for copying and distribution. See Dkt. 92, Ex. 2 (before his photographs were published Latimer wrote: "Kawasaki will list you guys in the flyer for sure. Please forward my credit info to them so that they might attach it on the back of the flyer, that would be cool. Thanks, Todd."). Thus, Latimer's protests to the contrary are refuted by his e-mail – he was clearly aware that at some point in time, Kawasaki intended to use his photographs in a print media. See also Dkt. 60, Ex. 6-I, Vol. II at 277-78.

photographs, with their respective metadata file attached, were included on a compact disk distributed to approximately 30 members of the media who attended the introduction of the ZX-14 motorcycle, including a representative of Cycle World Magazine[9] ("CWM"), a publication owned by Defendant Hachette Filipacchi Media U.S.  (Dkt. 60, Ex. 2 at 32).

On June 2, 2006, more than three months after Kawasaki published Latimer's ZX-14 photographs by including them in its media kit,[10] the Register of Copyrights granted Latimer's request for registration of a compilation of his photographs of the ZX-14 motorcycles, five of which are the protected works at issue in these proceedings, under Certificate of Registration No. VAu 700-638 (Dkt. 2, Ex. 1).

---

[9]Cycle World, a monthly publication targeting motorcycle enthusiasts, is distributed through subscriptions and newsstand sales throughout the United States and in some foreign countries.

[10]The significance of this delay is illustrated by the provisions of 17 U.S.C. § 412:

In any action under this title, . . .  no award of statutory damages or of attorney's fees, as provided by sections 504 and 505, shall be made for –

(1)   any infringement of copyright in an unpublished work commenced before the effective date of its registration; or

(2)   any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work.

17 U.S.C. § 412 (2005).  Section 412 is clarified in the following excerpt from the House Report on the 1976 Copyrights Act, 90 Stat. 2541 (1976):

Under the general scheme of the bill, a copyright owner whose work has been infringed before registration would be entitled to the remedies ordinarily available in infringement cases: an injunction on terms the court considers fair, and his actual damages plus any applicable profits not used as a measure of damages. However, section 412 would deny any award of the special or "extraordinary" remedies of statutory damages or attorney's fees where infringement of copyright in an unpublished work began before registration or where, in the case of a published work, infringement *commenced* after publication and before registration (unless registration has been made within a grace period of three months after publication).

Here, the protected work was first published on February 26, 2006.  Thus, Latimer had until May 26, 2006, within which to register his copyright for purposes of statutory damages and attorney's fees.  Latimer's registration of his copyright is effective June 2, 2006, one week after the three month period expired.

Del Cioppo posted Latimer's photographs of the ZX-14s on a Roaring Toyz website [www.roaringtoyz.com] to promote and advertise the sale of its merchandise and customization services. The photographs were also subsequently posted on a website featuring Roaring Toyz's customized parts for the ZX-14s, found at www.zx-14parts.com.

While he could not remember the name of the individual with whom he spoke, Del Cioppo testified that in an effort to get exposure for Roaring Toyz, he also had discussions with one of the publishers at CWM regarding publishing Latimer's photographs of the ZX-14s (Dkt. 60, Ex. 7 at 125).  According to Del Cioppo, he "called in some favors and . . . talked to one of the publishers. . . . to give him an exclusive, the opportunity to come in and photograph the ZX-14s at Roaring Toyz.  He declined." Id. Subsequently, CWM published three of the five ZX-14 photographs included in the material Kawasaki distributed during its unveiling of the ZX-14s in Las Vegas. The photographs were published in conjunction with a feature article written by Don Canet that appeared in CWM's June 2006 issue.

According to Latimer, he learned that the ZX-14 photographs he took on February 23-24, 2006, were being used without his permission when he read a copy of the June, 2006 issue of Cycle World[11] while in a barber shop[12] (Dkt. 60, Ex. 6-I at 203-04; 205). Believing that confronting Defendants about the unauthorized use of his photographs might be "professional suicide," Latimer delayed taking any action until late August, 2006, when he

---

[11]There are references in the record to the publication of Latimer's photographs in Cycle World's Annual Sport Bike Edition.  No such allegation is included in the complaint, and Latimer has not moved to amend the complaint to add this claim.

[12]The date on which Latimer made this discovery is unclear.  Latimer testified that he contacted an attorney before filing his request for copyright registration because he had learned that his photographs were being used without his permission.  He has little recall of the details, however.  As stated above, Latimer's request for copyright registration was approved on June 2, 2006.

contacted Kawasaki and informed it that his photographs were being used without his permission (Dkt. 60, Ex. 2 at 68-69).

Latimer sues Defendants for federal copyright infringement under 17 U.S.C. § 101 et seq. and unfair competition under Florida common law. Latimer seeks a permanent injunction preventing Defendants from infringing his copyright, an order directing Defendants to tender to him all infringing copies of his protected work that may be in their possession or control or destroy the protected work under a writ of destruction issued pursuant to 17 U.S.C. § 503, plus actual damages suffered as a result of the infringement and/or disgorgement of Defendants' profits that are not taken into account in computing actual damages (Dkt. 2 at 4-5).

## Legal Analysis

As discussed above, Latimer's central claims, brought pursuant to 17 U.S.C. § 501, allege that Defendants infringed his copyright in the ZX-14 photographs. Photographs received federal copyright protection in the Act of March 3, 1865, 38th Cong., 2d Sess., 16 Stat. 198. The idea that photography is art deserving copyright protection is now well settled. See 17 U.S.C. §§ 101,[13] 102(a)(5); see also Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53, 58 (1884) ("[T]he Constitution is broad enough to cover an act authorizing copyright of photographs, so far as they are representatives of original intellectual conceptions of the

---

[13]"'Pictorial, graphic, and sculptural works' include two-dimensional and three-dimensional works of fine, graphic, and applied art, photographs, prints and art reproductions, maps, globes, charts, diagrams, models, and technical drawings, including architectural plans. Such works shall include works of artistic craftsmanship insofar as their form but not their mechanical or utilitarian aspects are concerned; the design of a useful article, as defined in this section, shall be considered a pictorial, graphic, or sculptural work only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article." 17 U.S.C. § 101.

author."); Ets-Hokin v. Skyy Spirits, Inc., 225 F.3d 1068, 1074-75 (9th Cir. 2000) (citation omitted) (photographer brought infringement action against vodka producer alleging that producer's use of photographer's "product shots" constituted copyright infringement, fraud, and negligent misrepresentation); Rogers v. Koons, 960 F.2d 301, 306 (2d Cir.), cert. denied, 506 U.S. 934 (1992).

At its core, copyright law seeks "to promote the dissemination of creative expression, and provide incentives for copyright owners to produce . . . original works." CBS Broad., Inc. v. EchoStar Communications Corp., 265 F.3d 1193, 1211 (11th Cir. 2001). The plaintiff in a § 501 action establishes a prima facie case of copyright infringement by proving by a preponderance of the evidence (1) that he owns a valid copyright in the work allegedly infringed, and (2) that the defendant(s) copied that work. Original Appalachian Artworks, Inc. v. Toy Loft, Inc., 684 F.2d 821, 824 (11th Cir. 1982) ("The law is well settled that absent a fraud, or any purposeful attempt to mislead the Copyright Office, the court would not invalidate an otherwise valid Certificate of Registration").

Although copyright protection attaches at the time of an author's creation of an original work susceptible to copyright under 17 U.S.C. § 102(a), an owner's cause of action for infringement of that copyright is unenforceable until compliance with the formalities of registration, including payment of fees and deposit of copies of the work. 17 U.S.C. § 411. Ownership is also demonstrated through such compliance. In cases like Latimer's where registration was filed within five years after first publication of the work, the certificate of registration for the work "constitute(s) prima facie evidence of the validity of the copyright and of the facts stated in the certificate," 17 U.S.C. § 410(c), including the requirements of

originality and susceptibility to copyright under 17 U.S.C. § 102(a). <u>See</u> 3 Nimmer on Copyright § 13.01[A] at 13-4. The burden then shifts to the defendants to rebut this presumption of validity. <u>See</u> <u>id</u>. at 13-5.

Given that Latimer has produced a certificate of copyright registration for the ZX-14 photographs, he benefits from a rebuttable presumption that the copyright is valid. See 17 U.S.C. § 410(c) (1994). The burden, therefore, has shifted to the Defendants, who are required to demonstrate that "the work in which copyright is claimed is unprotectable (for lack of originality) or, more specifically, to prove that . . . the copyrighted work actually taken is unworthy of copyright protection." <u>Bateman v. Mnemonics, Inc.</u>, 79 F.3d 1532, 1541 (11th Cir. 1996). While the Defendants are permitted to copy the *idea* presented by Latimer's photographs, they cannot simply make copies of the photographs. <u>Blackman v. Hustler Magazine, Inc.</u>, 620 F.Supp. 792, 796 (D.D.C. 1985) (magazine which published a photographer's photographs infringed the photographer's copyrights), <u>aff'd</u> <u>in</u> <u>part</u>, <u>rev'd</u> <u>in</u> <u>part</u>, 800 F.2d 1160 (D.D.C. 1986) (on issue of damages).

Defendants do not dispute having used Latimer's photographs in activities of commercial value, and they have abandoned the issues of joint authorship and the sufficiency of originality raised in their motion for summary judgment, <u>see</u> Dkt. 92 at 1. They do, however, continue to assert that Latimer's photographs are derivative works.

**Derivative Work**

In an effort to establish that Latimer's photographs are unprotectable, Defendants assert that the subject matter of the action, the photographs of the Kawasaki ZX-14 taken by Latimer on February 23 – 24, 2006, are "unauthorized derivative works[14] based upon protectable preexisting works created and owned by Ryan Hathaway, and for which uses Latimer had not requested nor received a license" (Dkt. 60, Ex. 5 at 22-23; Ex. 6-II at 139-40). Defendants rely on Hathaway's deposition testimony, see Dkt. 60, Ex. 5 at 21, to support their argument that the paintwork on the ZX-14 motorcycles constitutes original and creative expression subject to protection under the copyright laws of the United States. See 17 USC § 102(5). Defendants assert that because the photographs they are accused of infringing depict both the ZX-14s and Hathaway's artwork (Exhibit A-b, A-c), they incorporate substantial portions of copyrightable works that does not belong to Latimer and for which he has no license (17 U.S.C. § 103(a); Dkt. 60, Ex. 5 at 23). Thus, Defendants conclude, as derivative works of Hathaway's artwork, Latimer's photographs are uncopyrightable.

Under 17 U.S.C. § 101, a derivative work must incorporate a substantial element of a preexisting work of authorship and recast, transform, or adapt those elements. See SHL Imaging, Inc. v. Artisan Homes, Inc., 117 F.Supp.2d 301, 305-06 (S.D. N.Y. 2000) (noting that "any derivative work must recast, transform or adopt the authorship contained in the preexisting work," the Court found that "the authorship of the photographic work is entirely

---

[14]"A 'derivative work' is a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a 'derivative work'." 17 U.S.C. § 101.

different and separate from the authorship of the sculpture" depicted in the photograph).[15] As explained in SHL Imaging, "a photograph of . . . [a] 'Puppy' sculpture in Manhattan's Rockefeller Center[ ] merely depicts that sculpture; it does not recast, transform, or adopt . . . [the] sculptural authorship. . . . [A]uthorship of the photographic work is entirely different and separate from the authorship of the sculpture." Id. at 306. The SHL court further noted:

> This is not to suggest that photographs are incapable of derivative authorship. A cropped photograph of an earlier photograph is a derivative work. Re-shooting an earlier photographic work with some alteration of the expressive elements is another example. However, in both cases the nature of photographic authorship would have been recast, adapted, or transformed. Since plaintiff's photographs merely depict defendants' frames and do not recast, adapt or transform any authorship that may exist in the frames, they are not derivative works.

Id.

It is undisputed that the artwork on the motorcycles is the original, creative expression of Ryan Hathaway, and as such, entitled to copyright protection.[16] Defendants contend that

---

[15]The Court rejects Defendants' argument that its reliance on the SHL decision is misplaced. Having reviewed the language employed by Congress in defining a "derivative work," see 17 U.S.C. § 101, this Court is not persuaded by Defendants' contention that the holding in SHL is contrary to "expressed Congressional intent."

[16]Defendants attack the validity of Latimer's copyright because the paintwork on the ZX-14s was done by Ryan Hathaway, who Defendants claim was an independent contractor (rather than a Roaring Toyz employee) with no written contract expressly identifying his design as a "work for hire." Generally, ownership of a copyright vests initially with the author of the work. 17 U.S.C. § 201(a) ("[T]he author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection."). See Community for Creative Non-Violence v. Reid, 490 U.S. 730, 737 (1989) (citing 17 U.S.C. § 102). Where the creation is a "work for hire," the author (and, accordingly, the owner) of the work is considered to be the actual creator's employer.
  Here, Hathaway worked in his own shop located in Lake Placid, Florida, approximately 30 minutes from Roaring Toyz facility in Sarasota, Florida. Hathaway had provided services to Roaring Toyz for five to six years, during which he also produced work for other companies and individuals. While Roaring Toyz could commission other work, it did not have the right to arbitrarily assign Hathaway additional projects, and Hathaway retained complete discretion over when and how long he worked. Early in their relationship, Roaring Toyz paid Hathaway in cash, but by the time the ZX-14 project commenced, Roaring Toyz had begun paying by check upon completion of a project. Roaring Toyz works with the customization of the equipment on the motorcucles, leaving body and paint work to outside contractors such as Hathaway, eliminating the need to provide employee benefits and leaving the tax treatment to the contractor. Applying the factors set out in Reid, Hathaway's artwork on the ZX-14s does not constitute a work for hire under the Copyright Act. See 17 U.S.C. §§ 102; 201. Hathaway has not taken the steps necessary under the Copyright Act to register his art work on the ZX-14s.

since Hathaway did not grant a license to Latimer to make a derivative work by photographing Hathaway's artwork, the photographs at issue are unauthorized derivative works. The Copyright Act states that "[a] work consisting of editorial revisions, annotations, elaborations, or other modifications [to a preexisting work that], as a whole, represent an original work of authorship, is a 'derivative work.'" 17 U.S.C. § 101. If, however, it is non-infringing and sufficiently original, such a work qualifies for a separate copyright. See 17 U.S.C. § 103 (1994); Stewart v. Abend, 495 U.S. 207, 223-24 (1990).

The Court rejects Defendants' argument that Latimer can have no copyrightable interest in his photographs. Here, Latimer has not altered Hathaway's artwork, recast it, or otherwise transformed it during the photographic process.  See Lee v. A.R.T. Co., 125 F.3d 580, 582-83 (7th Cir. 1997). The ZX-14s are the subject of the photographs. Hathaway's artwork has not been transformed in the slightest - it is presented in a different medium, but it has not been changed in the process such that it meets the criteria for a derivative work under copyright law.  While Latimer has copyrighted photographs of the ZX-14s, he does not seek to monopolize the subject matter or idea of the photographs but merely to protect the actual reproduction of his expression of the idea, to wit, the photographs themselves.  As in SHL Imaging, Latimer has not "recast, transform[ed], or adopt[ed]" Hathaway's artwork.[17] Defendants' argument that Latimer's photographs are derivative works  lacks merit.

---

[17]From the record now before the Court, Hathaway appears to have a copyrightable interest in the artwork on the ZX-14s, although not an enforceable right under the Copyright Act because, as discussed above, he has not met the statutory requirements prerequisite to an author bringing suit for copyright infringement.

As stated above, Defendants have abandoned their challenge to the originality of Latimer's photographs and their contention that the photographs constitute "joint" works for purposes of copyright protection.

**Implied License**

The Copyright Act provides that "[a] transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a). It is undisputed that Latimer never executed a document granting an exclusive license to Defendants, and therefore, no valid transfer of copyright ownership under the Copyright Act took place.

In contrast to an exclusive license, a nonexclusive license to use a copyright "'may be granted orally, or may even be implied from conduct.'" Korman v. HBC Florida, Inc., 182 F.3d 1291, (11th Cir. 1999) (quoting Effects Associates, Inc. v. Cohen, 908 F.2d 555, 558 (9th Cir. 1990)[18]). Section 101 excludes the assignment of nonexclusive licenses from the definition of "transfer of copyright ownership." Kawasaki requested that Roaring Toyz provide it with photographs of the customized ZX-14s.  Roaring Toyz asked Latimer to do the photography. Latimer created the photographs at issue at Roaring Toyz's request and e-mailed the proofed photographs to Del Cioppo, knowing at the time that Kawasaki would be the ultimate recipient of his work. As discussed above, the record contradicts Latimer's

---

[18]In Effects Associates, the Ninth Circuit held that a special effects company had granted a movie producer an implied nonexclusive license to use the special effects footage it had created. The court reasoned that because the special effects company had "created a work at defendant's request and handed it over, intending that defendant copy and distribute it," it had impliedly granted the defendant a nonexclusive license. Id.

assertion that he limited use of the photographs to a "placard," instructing Del Cioppo that no further use of the photographs was authorized.

Impressed with Latimer's photographs, Kawasaki requested permission to use the photographs for inclusion in its press release materials. This request was conveyed to Latimer by Del Cioppo. Latimer consented to Kawasaki's request, conditioned on his receiving credit for his work (Dkt. 60, Ex. 6-I at 116-17; 120). See Jacob Maxwell, Inc. v. Veeck, 110 F.3d 749 (11th Cir. 1997). The metadata files for the photographs included in the press kit contained Latimer's copyright notice.

Latimer impliedly granted Kawasaki a nonexclusive license to use the photographs in its press release materials. Kawasaki, in turn, distributed a compact disk containing five of Latimer's photographs to members of the media, including a CWM representative.

Here federal copyright law renders any oral agreement that Latimer may have had with Roaring Toyz and Kawasaki unenforceable insofar as it provided for the transfer of an exclusive copyright. The Eleventh Circuit has recognized that "in these circumstances, a court has no choice but to look at alternatives beyond the parties' intended arrangement." Jacob Maxwell, Inc. v. Veeck, 110 F.3d at 752. While it may well be that Latimer initially contemplated an exclusive license, Latimer cannot reasonably deny, given his deposition testimony, that he granted to Kawasaki the sort of lesser, nonexclusive license to use the photographs in promoting its unveiling of the ZX-14s that federal law recognizes may result from a purely oral transaction.

Latimer's failure to withdraw permission for use of the photographs until August 2006 clearly evidenced his consent for Kawasaki to use the photographs in promoting the

introduction of the ZX-14s. Implicit in that permission was a promise not to sue for copyright infringement – a promise that at least one court has found to be the essence of a nonexclusive license. See In re CFLC, Inc., 89 F.3d 673, 677 (9th Cir. 1996) ("[A] nonexclusive patent license is, in essence, 'a mere waiver of the right to sue' the licensee for infringement.") (quoting De Forest Radio Telephone & Telegraph Co. v. United States, 273 U.S. 236, 242 (1927)). It follows that until permission was withdrawn in August, Latimer granted Kawasaki a nonexclusive license to use the photographs of the ZX-14s.

As to Defendant Hatchette, Latimer's arguments are equally unavailing to his cause. A copyright grants to the owner several exclusive rights, including the right to reproduce the copyrighted work and to distribute copies to the public, but under the "fair use" doctrine, codified at 17 U.S.C. § 107, some limited and useful forms of copying and distribution are tolerated as exceptions to copyright protection.   See Pacific and Southern Co., Inc. v. Duncan, 744 F.2d 1490, 1494 (11th Cir. 1984). Specifically, § 107 provides fair use may be made of material "for purposes such as criticism, comment, news reporting, teaching. . . , scholarship, or research."  17 U.S.C. § 107.  The four factors in determining fair use are:

1. the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

2. the nature of the copyrighted work;

3.  the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

4. the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107; <u>Pacific and Southern Co., Inc. v. Duncan</u>, 744 F.2d 1490, 1495 (11th Cir. 1984).

A representative of CWM, owned and published by Defendant Hachette, received a copy of the compact disk Kawasaki distributed at its introduction of the ZX-14s to the press. The photographs were used without modification in a feature article published in the June 2006 issue of Cycle World.  A review of the article accompanying the publishing of Latimer's photographs reveals that the article was of a technical nature, reviewing and commenting on the design and performance of the ZX-14 motorcycle. Latimer makes no allegation that Defendant Hachette acted in bad faith in publishing the photographs.  The photographs themselves were not offered for commercial gain, and there is no indication that the use of the photographs in Cycle World's article affected the "potential market for or value" of the photographs.  To the contrary, Latimer testified that by the time Cycle World published its review of the ZX-14s, with accompanying photographs, two of his photographs of the ZX-14s had been published on placards used at the Kawasaki display booth during Daytona Beach Bike Week in March 2006, and his article, with accompanying photographs, had already been published in 2Wheel Tuner.  Following publication of the photographs in Cycle World, Latimer successfully marketed the right to use several photographs he had taken of the ZX-14s to two foreign publications. Applying the § 107 factors, the Court concludes that Latimer's claim against Defendant Hatchette fails. Thus, Defendants Kawasaki and Hachette are entitled to judgment as a matter of law on Latimer's copyright infringement claims.

As to the use of Latimer's photographs of the ZX-14s on the Roaring Toyz websites, there are genuine issues of material fact that preclude granting Defendants summary judgment in favor of Roaring Toyz and Fisher. Latimer consistently maintains that both before and after the ZX-14 photographs were made, he informed Fisher that his photographs were not to be "leaked," meaning, according to Latimer, that they were not to be posted on any website (Dkt. 60, Ex. 6-I at 133). Fisher maintains that the photographs were posted on the website with Latimer's permission, as had been their arrangement from the time Latimer began taking photographs of Roaring Toyz work in June 2005.

An implied nonexclusive license may be established through the parties' course of dealing. Given the contradictions in testimony regarding their course of dealing, a reasonable juror may find that Latimer and Roaring Toyz/Fisher had entered into a mutually beneficial business relationship, with Roaring Toyz/Fisher benefiting from the use of Latimer's photographs on the website and Latimer benefiting from the link between the Roaring Toyz website and his website, as well as the introductions Fisher provided Latimer to people in the motorcycle industry. In light of Latimer's acknowledgement that he gave Kawasaki his consent to use the photographs in its press kit, to be distributed two days after the photographs were taken, and on placards that were to be displayed in the Kawasaki booth at Bike Week from March 3 through 8, 2006, a reasonable juror may find that the photographs were used without Latimer's permission on the Roaring Toyz website yet not be persuaded that Latimer incurred any damages as a result.

While Latimer waived his right to sue for copyright infringement, an oral understanding with Defendants as to compensation would have been enforceable. The

evidence in the record regarding such an understanding is, however, contradictory. Latimer

first testified that he never discussed compensation for the ZX-14 photographs with Fisher

(Dkt. 60, Ex. 6-I at 143-44). When asked why he did not charge Roaring Toyz a fee for the

ZX-14 photographs, the following exchange occurred:

> Latimer:    Because these bikes were done, they were completed and I was working
> on a story [for 2Wheels Tuner], so I went down there, and I could have
> shot these and got filed in case someone tried to scoop me at Daytona or
> anybody else.
>
> . . . .
>
> Attorney:   So you were compensated because you could use these [photographs] in
> your magazine article?
>
> Latimer:    Yes, these had value.
>
> Attorney:   Okay. So therefore you never charged Mr. Fisher for these photographs?
>
> Latimer:    I was not paid for the shoot, no.

Dkt. 60, Ex. 6-I at 145.  Latimer later reemphasized that he believed that "the most valuable

part [of the photographs] was the publicity," id. at 275.  He contradicted this testimony,

however, when he testified that he always requested payment for his work before he

delivered the final product to a client, and he was sure he made a request for payment for the

ZX-14 photographs, Dkt. 60, Ex. 6-I at 273-74. Notably, if this version of Latimer's

testimony proves true, the ZX-14 photographs at issue may constitute works-for-hire, see 17

U.S.C. §§ 102; 201. In that event, Latimer's claims against Roaring Toyz and Robert Fisher

fail as a matter of law.

Fisher testified that before Latimer left the shop on February 24, 2006, Latimer went

to Fisher's office and asked for $800.00 as payment for his services that night. Surprised

because Latimer had never requested payment for previous photographs, Fisher nonetheless wrote Latimer an $800.00 check. Latimer, on the other hand, testified that Fisher owed him $800.00 for work performed on February 14 and 16, 2006. Latimer further testified that when the shoot was finished, he went to Fisher's office and stated "I'm done. I need to be paid." According to Latimer, the request for payment had nothing to do with the ZX-14 photo shoot.

As discussed above, a finding that Fisher paid Latimer for his services may, under the circumstances, render the photographs a work for hire. See supra n.16 discussing works for hire. If Defendants establish that the photographs qualify as works for hire, Fisher and Roaring Toyz had the right to unfettered use of the photographs. This matter will proceed to trial on Latimer's copyright claims against Roaring Toyz and Fisher.

**Common Law Unfair Competition Claim**

The Eleventh Circuit has considered whether section 301(a) of the Copyright Act preempts an unfair competition claim. See, e.g., Lipscher v. LRP Publications, Inc., 266 F.3d 1305, 1312 (11th Cir. 2001) (affirming dismissal of unfair competition claim because it was based on "acquisition misconduct," and, since acquisition of a work is a necessary condition to copying it, there is no "extra element" removing it from the general scope of a copyright claim). Latimer seeks only to protect those rights equivalent to those protected in § 106 of the Copyright Act. Accordingly, in the absence of any allegations of the necessary "extra element," Latimer's unfair competition claim is preempted and must be dismissed.

**Indirect Profits**

Finally, Defendants contend that Latimer's evidence cannot support a finding of indirect profits earned by any Defendant. Given that Latimer's photographs were posted on

-22-

at least two websites maintained by Del Cioppo to promote the sale of Defendant Roaring Toyz's products and services, the jury may find that Defendants Roaring Toyz and Robert Fisher infringed Latimer's copyright in the ZX-14 photographs. The matter of damages is likewise a factual issue that should be left to the jury.

**Conclusion**

For reasons set forth above, the Court finds that there are no genuine issues of material fact that require submission of this matter to a jury as to Defendants Kawasaki and Hatchette. As to Defendants Roaring Toyz and Fisher, they are entitled to judgment as a matter of law on Latimer's unfair competition claims, but genuine issues of material fact require that this matter go forward on Latimer's copyright infringement claims.

Accordingly, it is hereby **ORDERED and ADJUDGED** that:

1.   Defendants' Motion for Summary Judgment (Dkt. 59) is **GRANTED** as to all Defendants on Latimer's unfair competition claim and Defendants Kawasaki and Hachette as to Latimer's copyright infringment claims and **DENIED** as to Defendants Roaring Toyz and Robert Fisher as to Latimer's copyright infringement claims.

2.   Defendants Roaring Toyz and Robert Fisher's Motion for Reconsideration (Dkt. 87) is **DENIED** as moot.

3.   The **Clerk** is directed to enter summary final judgment in favor of Defendants Kawasaki and Hachette on all claims.

**DONE** and **ORDERED** in Tampa, Florida on August 7, 2008.

_____
JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel/Parties of Record
S:\Odd\2006\06-CV-1921 sj mtn final edit 2.wpd